# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>Jacob Allen Meinhardt,<br><br>　　　　Defendant. | CR 13-00469-TUC-JGZ (JR)<br><br>**REPORT AND RECOMMENDATION** |

　　　　This matter was referred to Magistrate Judge Rateau for pretrial matters. A Motion to Suppress was filed by Defendant Jacob Allen Meinhardt ("Defendant") arguing that there was no reasonable suspicion to stop the car he was driving. (Doc. 20). The motion was heard on August 28, 2013. (Doc. 28). Defendant was present and represented by counsel. The Government presented two witnesses, United States Border Patrol Agents Vincent Mendola and Manuel Mendiola. The witnesses were examined and cross-examined. Defendant presented one witnesses, Alfredo Martinez, an investigator with the Office of the Federal Public Defender. Having

1

considered the matter, the Magistrate Judge submits the following Findings of Fact and Conclusions of Law and recommends that Defendant's Motion be DENIED.[1]

## I. Findings of Fact

### A. Agent Mendola

Agent Mendola testified that he has worked at the Wilcox Station since 2006, and is currently assigned to the San Pedro Valley Unit. (TR 6, 7).[2] He works the fixed checkpoints on Arizona State Routes ("SR") 90 and 80; he is also a certified K-9 handler. (TR 7, 8, 21). He has worked the checkpoints with his K-9 for two years. (TR 21).

The agent described the area surrounding SR 90 as a wilderness versus commercial type area. (TR 11). SR 90 itself is two lanes heading northbound and two heading southbound. (*Id*.). The checkpoint is at milepost 304, north of Whetstone, about 20 miles north of Sierra Vista, and more than 50 miles from the border. (TR 37). During the day, if a person approaches the checkpoint, they can visibly see a canopy tarp covering the checkpoint. (TR 14). At night, the whole inside of the canopy is illuminated. (*Id.*). The first sign leading up to the checkpoint is about a mile out and says, "United States Border Patrol checkpoint." (TR 13:24-25). The sign also indicates whether the checkpoint is open or closed. (TR 13).

---

[1] Trial is currently scheduled for October 8, 2013, and the plea deadline is September 20, 2013.

[2] TR refers to the transcript of the August 28, 2013 hearing.

1  After that first sign, there are other signs asking motorists to slow down and telling
2  them that they must stop. (TR 14). There is visible Border Patrol presence as well as
3  marked units at the checkpoint. (TR 14, 15).

4  On February 20, 2013, Agent Mendola was the acting supervisor and was
5  working the 2:00 p.m. to 10:00 p.m. shift. (TR 8-12). He was wearing his uniform
6  with various badges and patches that identified him as a Border Patrol Agent, but he
7  was not in a marked patrol car. (TR 10, 17). At the time, there was a significant
8  storm passing through the area. (TR 12). The storm brought strong wind, sleet, rain
9  and snow. (*Id.*). The roads were wet and icy in certain spots. (TR 38).

10  Agent Mendola arrived at the checkpoint at 4:00 p.m. and advised everyone
11  that for safety reasons, the checkpoint was going to be closed. (TR 13). Agents were
12  worried that cars would strike each other or other agents. (TR 13). According to
13  the agent, there are times when the checkpoint is down due to inclement weather.
14  (TR 21). It often happens during monsoon season and during the few storms in the
15  winter. (*Id*.). When the checkpoint is down, smuggling of illegal aliens and
16  controlled substances increases. (TR 21, 22). Agent Mendola has interdicted such
17  loads when the checkpoint is down. (TR 22).

18  Earlier that day, because he had been informed by other agents that they had
19  seized four marijuana loads, Agent Mendola was on high alert. (TR 19). One load
20  was seized early afternoon on SR 90 and another at 5:00 p.m. on that same road. (TR
21  19,20). An hour and a half later, another load was seized on SR 80 and yet another
22

3

1   was stopped during the evening on that route. (TR 20). One of those loads
2   originated in Sierra Vista. (TR 46).

3       At 10:30 p.m., Agent Mendola was sitting on the right side of the road a few
4   yards north of the checkpoint and observing traffic. (TR 16, 17, 22). At that time of
5   the night, he observed one car traveling by every few minutes. (TR 42). He looked
6   to the right, south of the checkpoint, and saw three sets of headlights travelling
7   northbound in close proximity to one another coming towards him. (TR 17, 18, 45).
8   The third vehicle was a white SUV and, as it passed Agent Mendola, he noticed that
9   the driver was not seated in a comfortable position but was pressed up against the
10  steering wheel. (TR 24, 25, 29, 30). In his experience, people who are driving illegal
11  cargo often drive that way when they are nervous. (TR 25).

12      Another factor Agent Mendola considered was that it was nighttime and close
13  to shift change. (TR 26, 27). In his experience, organizations run their loads close
14  to shift change because they think the agents get lax toward the end of the night.
15  (TR 27). On cross examination, the agent admitted that they do not all work the
16  same shift and that they have three shifts just to make sure that the area is covered.
17  (TR 49).

18      Based on those observations, Agent Mendola decided to pull out and get a
19  registration check on the white SUV. (TR 27). As he tried to get behind it, it
20  increased its speed and then abruptly cut in front of the car in front of him causing
21  that car to hit its brakes. (TR 27, 28). He was able to run a registration check on the
22  car and learned that the SUV was registered to a female out of Sierra Vista, a town

1 about 20 miles south of the checkpoint. (TR 29, 30). At that point Agent Mendiola
2 pulled alongside the SUV and Agent Mendola slowed down to get behind the car.
3 (TR 31). He then noticed that the back driver's side window was open about a
4 quarter of the way. (*Id*.). That was significant because it was about 30 degrees
5 outside and as they travelled north, there was snow, sleet, rain and wind. (TR 32).
6 He thought that abnormal because if someone is going to smoke a cigarette, they are
7 going to roll down their own window. (*Id.*). Agent Mendola testified that in the past,
8 he has intercepted a few alien loads with the car windows down. (*Id*.). The windows
9 are sometimes down due to the smell of the people who have been out in the desert,
10 especially when the heat is on in the car during the winter. (*Id*.). On cross
11 examination, the agent admitted that when he saw Defendant's window, it was open
12 before he drove into the bad weather. (TR 41).

13 Agent Mendola also testified that at some point he radioed Agent Mendiola
14 and asked for assistance. (TR 30). Thinking that Agent Mendiola had a better view
15 from his car, Agent Mendola asked Agent Mendiola to drive alongside the SUV.
16 (*Id*.). Agent Mendiola then conveyed to Agent Mendola that the SUV swerved, and
17 made sudden right and left movements and the driver kept reaching for something.
18 (TR 32, 33, 34). Believing that the white SUV was transporting illegal aliens, Agent
19 Mendola activated his emergency lights and conducted a traffic stop. (Doc. 20, TR
20 33, 34). The driver of the SUV was the Defendant. (Doc. 1). A search of the SUV
21 yielded bundles of marijuana. (*Id*.).

22

**B.     Agent Mendiola**

Agent Mendiola testified that he has been a Border Patrol Agent for two years and has worked in the Wilcox area for that entire time. (TR 53, 54). On February 20, 2013, he was working the 4:00 p.m. to midnight shift. (TR 55). He was driving his marked service vehicle and was in uniform. (TR 54, 56). At 10:30 p.m., he was on SR 90 near mile marker 304 just south of the checkpoint. (TR 56). He saw three cars pass him by; they looked like they were driving in tandem. (*Id.*). The agent did not notice anything abnormal about the three automobiles but did see that Agent Mendola went out after them at which time he also pulled out. (TR 57). Agent Mendola advised Agent Mendiola over the service radio that he was going to take a second look at the white SUV. (TR 58).

A little later, Agent Mendola asked him if he would pull alongside the vehicle and confirm that the driver was male. (*Id.*). Agent Mendiola saw that it was a Caucasian male driving the SUV and also noticed that his rear driver's side window was open about a quarter of the way. (*Id.*). There were no passengers in the SUV. (TR 62). There was nothing significant about the driver, but he did find it unusual that the window was partly open since it was really cold out that night. (TR 58, 59).

As Agent Mendiola was observing the driver he also noticed that the driver was rigid[3] and was trying to reach down, crouching over to his right as if trying to grab something. (TR 59, 60). He did that multiple times in a bouncing like fashion.

---

[3] On cross-examination, Agent Mendiola admitted that his report made no mention that the driver was "rigid." (TR 65).

6

1  (TR 60).  Thinking that the driver might be reaching for a weapon, he conveyed his
2  observations to Agent Mendola.  (*Id*.).

3  **C.  Investigator Martinez**

4  Mr. Martinez testified that he has been an investigator with the Office of the
5  Federal Public Defender for four years.  (TR 67).  He also worked as an officer for
6  the Arizona Department of Public Safety for 24 ½ years and in that job had an
7  opportunity to travel in the area of Sierra Vista.  (*Id*.).  He travelled the area with
8  regard to the present case.  (*Id*.).

9  According to Mr. Martinez, Defendant was stopped at milepost 291 on SR 90
10 which is a mile south of I-10.  (TR 68).  The checkpoint at milepost 304 is 14 miles
11 from the interstate and 53 miles from the Naco port of entry.  (TR 68, 69).  SR 90 is a
12 main thoroughfare, the most direct route to the Mexico port of entry and a heavily
13 travelled highway (TR 68, 71); SR 90 is the most direct route from Sierra Vista to
14 Tucson which connects to I-10 (TR 10, 68); and SR 90 can be used to get to other
15 cities such as Huachuca City, Sierra Vista and even Bisbee.  (TR 68).  Mr. Martinez
16 also testified that a person can take SR 82 to circumvent the milepost 304 checkpoint
17 and there is no checkpoint on that route.  (TR 70, 71).

18 **II.    Conclusions of Law**

19 The Fourth Amendment protects the right of the people to be secure in their
20 person, houses, papers, and effects against unreasonable searches and seizures.
21 *United States v. Hensley*, 469 U.S. 221, 226 (1985).  Consistent with the Fourth
22 Amendment, police may stop persons in the absence of probable cause under limited

circumstances. *Terry v. Ohio*, 392 U.S. 1, 88 (1968). Law enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity. *Hensley*, 469 U.S. at 226.

Reasonable suspicion exists when an officer is aware of specific articulable facts, that, together with rational inferences drawn from them, reasonably warrant a suspicion that the person to be detained has committed or is about to commit a crime. *United States v. Cortez*, 449 U.S. 411, 416-18 (1981). When assessing the reasonableness of the police officer's actions, the court must consider the totality of the circumstances which confronted the officer at the time of the stop. *United States v. Sokolow*, 490 U.S. 1, 8 (1989).

The articulable facts forming the basis of a reasonable suspicion must be measured against an objective reasonableness standard, not by the subjective impressions of a particular officer. *Gonzalez-Rivera v. I.N.S.*, 22 F.3d 1441, 1445 (9th Cir. 1994). An officer is however, "entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975). But the inferences drawn from an officer's experience must be objectively reasonable. *United States v. Montero–Camargo*, 208 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

In relation to stops by border patrol, the totality of circumstances may include:

(1) characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver, including obvious attempts to evade officers; (6) appearance or behavior of passengers; (7) model and appearance of the vehicle; and, (8) officer experience.

8

*United States v. Berber–Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007) (*quoting United States v. Garcia–Barron*, 116 F.3d 1305, 1307 (9th Cir. 1997)).

Guided by these factors and any other considerations relevant to the totality of the circumstances, the Court must determine whether the factors cited by the Government in support of the stop constitute behavior that should excite the suspicion of a trained border patrol agent that criminal activity is afoot. *See United States v. Rodriquez*, 976 F.2d 592, 595 (9th Cir. 1992), *amended by United States v. Rodriquez*, 997 F.2d 1306 (9th Cir. 1993).

### A. Characteristics of the Area and Previous Drug Smuggling

Agent Mendola, testified that the checkpoint on SR 90 is a fixed checkpoint that is 50 miles from the border. For safety reasons, the checkpoint closes when the weather is bad. The checkpoint is clearly visible to all drivers. It is covered by a large canopy tarp, is clearly marked as a Border Patrol checkpoint and there are signs instructing drivers to slow down and stop. There are also signs that indicate when the checkpoint is open and closed. During the evening, the checkpoint is illuminated.

According to Agent Mendola, who has been a Border Patrol Agent since 2006, he has worked both the SR 80 and the SR 90 checkpoints with his K-9 for two years. In his experience, when a checkpoint goes down, smuggling of illegal aliens and controlled substances goes up. Given the inclement weather and the high visibility of the checkpoint when operational, it was reasonable for Agent Mendola to conclude that drug and alien transporters would know when the checkpoint was closed and act

9

1  accordingly. His inference was bolstered by the fact that agents had seized other
2  marijuana loads that day. *See Berber-Tinoco*, 510 F.3d at 1088 (The totality of the
3  circumstances analysis includes a consideration of the modes or patterns of operation
4  of certain kinds of law-breakers.)

5    **B.**  **Patterns of Traffic and Time of Day**

6    While not specifically articulated as a reason for the stop, Agent Mendiola
7  does state that when he first saw the three cars pass his location, "it looked like they
8  were driving in tandem." (TR 56:25). Traveling in tandem can be a factor that can
9  be considered in developing reasonable suspicion, however, the determination must
10 be based on more than the "briefest of observations." *United States v. Robert L.*, 874
11 F.2d 701, 704 (9th Cir. 1989). Here, the evidence of tandem driving is scant and not
12 deserving of any weight.

13   According to Agent Mendola, it was 10:30 p.m. and close to shift change. In
14 his experience, drug organizations run their loads during this time because they think
15 police may get lax toward the end of the night. The record does not support this
16 inference. On February 20, 2013, Agent Mendola was working the 2:00 p.m. to 10:00
17 p.m. shift. Agent Mendiola was working the 4:00 p.m. to midnight shift. The
18 Defendant was stopped at 10:30 p.m, nowhere near a shift change. Additionally, not
19 all agents work the same shift and they have three shifts to make sure the entire area
20 is covered.

21
22

### C. Behavior of Driver

According to the agents, the Defendant was driving in an uncomfortable position and was pressed up against the steering wheel, which indicated to Agent Mendola that the driver was nervous and possibly carrying illegal cargo. Both agents testified that there was a strong storm in the area. It brought heavy winds, snow, rain and sleet. The highway was wet and slick in some areas. Given the inclement weather, the Court finds that most anyone driving through or approaching a storm of this magnitude, would be sitting in a rigid, alert and upright manner. Defendant's driving position is entitled to very little weight.

Defendant's driving behavior, however, is highly relevant. According to Agent Mendiola, who was in full uniform and driving his marked service vehicle, when he tried to get behind the white SUV, it increased its speed and then abruptly cut in front of the car in front of it, causing that car to hit its brakes. He also observed the SUV swerve, making sudden right and left movements while the agent drove alongside it. While swerving on a wet icy road is not unusual, Agent Mendiola did find it suspicious that the driver crouched down and reached multiple times, in a bouncing like fashion, as if trying to reach something, perhaps a weapon, in the front passenger side of the car. The Defendant's driving behavior carries significant value in the reasonable suspicion calculus in this case.

### D. Characteristics of the Vehicle

According to Agent Mendola, at 10:30 p.m., when he was observing traffic a few yards north of the checkpoint, he saw one car traveling by every few minutes.

11

1 One of the cars he saw was an SUV that was registered to a woman out of Sierra
2 Vista. It was driven by a man. The Court gives no weight to this observation. SR 90
3 is the main thoroughfare used by Sierra Vista residents to travel from Sierra Vista to
4 Tucson. Sierra Vista is a city with over 43,000 residents, almost half of whom are
5 women. *See* http://zip-codes.com/city/az-sierra-vista-2010-census.asp (estimated
6 population in Sierra Vista for 2010 is 43,888; of those, 49.1 percent are women and
7 50.9 percent are men). Many women likely register their automobiles under their
8 name but allow their husbands, boyfriends, fathers and sons to drive the car. SR 90
9 is a heavily travelled road, one used to get to Huachuca City and Bisbee and also the
10 most direct route from Naco to the Mexico Port of Entry. *See also United States v.*
11 *Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2001) (reasonable suspicion
12 cannot be based on broad profiles that cast suspicion on entire categories of people
13 without any individualized suspicion of the particular person to be stopped.).

14 Agent Mendola also testified that the back driver's side window was open a
15 quarter of the way down and to him, that was indicative of alien smuggling. Even if
16 Defendant's window was down before he drove into the storm as argued by the
17 defense, it was nonetheless unusual since it was 30 degrees outside. If the Defendant
18 needed to crack open a window to comfortably smoke, he would have likely opened
19 the driver's side window and not the back window. Since there were no passengers
20 in the backseat who might be smoking, then the back window would not be open for
21 that reason either. In Agent Mendola's experience, people who are smuggling aliens
22 who have been walking in the desert may not smell very good, prompting the driver

to open a window. That would especially be the case if it was cold outside and the driver was running the heater in the car. While this factor in and of itself does not indicate criminal activity, combined with the police officer's experience, it does deserve some weight in the evaluation of reasonable suspicion.

### E.   Totality of Circumstances

The objectively reasonable factors relied upon by the agents in this case were as follows: (1) due to bad weather, the checkpoint was not operational, prompting agents to believe that alien and drug transportation would increase; (2) previous drug seizures had been made that day, thereby putting agents on high alert; (3) the Defendant drove erratically, leading agents to believe he was trying to evade police; (4) the Defendant repeatedly reached into the passenger's side of the SUV while followed by police, prompting agents to believe he might be reaching for a weapon; and (4) the back window of the Defendant's SUV was partially open, causing agents to believe that his cargo smelled unpleasant.

Giving due weight to the factual inferences drawn by the law enforcement officers, the Court finds that Agent Mendola had reasonable suspicion to believe that Defendant was engaged in illegal activity. The stop comported with the Fourth Amendment.

## III.   Recommendation for Disposition by the District Judge

Based on the foregoing and pursuant to 28 U.S.C. § 636(b) and Local Rule Civil 72.1, Rules of Practice of the United States District Court, District of Arizona,

1  the Magistrate Judge recommends that the District Court, after an independent review

2  of the record, DENY Defendant's Motion to Suppress (Doc. 14).

3  This Report and Recommendation is not an order that is immediately

4  appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to

5  Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of

6  the District Court's judgment in the case.

7  The parties have fourteen (14) days from the date of service of a copy of this

8  report and recommendation to file specific written objections with the District Court.

9  See 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of

10  Civil Procedure.

11  Thereafter, the parties have ten (10) days within which to file a response to the

12  objections. No replies are permitted without leave of court.

13  If any objections are filed, this action should be designated case number: CR

14  13-469-TUC-JGZ.  Failure to timely file objections to any factual or legal

15  determination of the Magistrate Judge may be considered a waiver of a party's right

16  to de novo consideration of the issues.  *See United States v. Reyna-Tapia*, 328 F.3d

17  1114, 1121 (9th Cir. 2003) (en banc).

18  Dated this 13th day of September, 2013.

19

20  *Jacqueline M. Rateau*
    Jacqueline M. Rateau
21  United States Magistrate Judge

22